IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL CARTER, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| SUNGARD AVAILABILITY SERVICES, LP, | : | No. 17-3639 |
|     Defendant. | : | |

### MEMORANDUM

**Schiller, J.**                                                                                                                                         **March 11, 2019**

Michael Carter sued Sungard Availability Services, LP ("Sungard"), under the Fair Labor Standards Act ("FLSA"), the Pennsylvania Minimum Wage Act ("PaMWA"), and for unjust enrichment. He claims that Sungard failed to pay overtime.

Sungard moves for summary judgment on the FLSA claim, arguing that it is time-barred. Alternatively, Sungard argues that Carter is exempt from the FLSA and PaMWA overtime provisions because he worked in an administrative position, and that his unjust enrichment claim is preempted by his FLSA claim.

Carter seeks summary judgment, asserting that he is not exempt from overtime compensation under the administrative exemption. For the reasons set forth below, the Court will deny Carter's motion and will deny Sungard's motion, except as to the unjust enrichment claim.

**I.    BACKGROUND**

    **A.  Facts**

Sungard provides several technology-related services, including "disaster recovery, availability services," and "managed security services." (Daniel Watson Dep. at 9, Dec. 4, 2018 [Watson Dep.].) Sungard hired Carter in August 2013 as a security analyst in its Philadelphia, Pennsylvania office. (Carter's Terms of Offer; Michael Carter Dep. at 77, Aug. 23, 2018 [Carter

Dep.].) As a security analyst, Carter received a base salary of $55,000 per year. (Def.'s Opp'n to Pl.'s Statement of Undisputed Facts [Def.'s SOF Resp.] ¶ 2.) Sungard scheduled Carter to work forty-eight hours every other week, though it disputes whether Carter actually worked those hours. (Def.'s SOF Resp. ¶ 3.) Carter's employment ended in January 2016. (Def.'s First Reqs. for Doc. Produc. at 11; Pl.'s Resp. to Def.'s First Reqs. for Doc. Produc. at 2.)

Carter was "responsible for monitoring, investigation, response and support tasks related to the operation of Sungard AS information security program." (LinkedIn Job Description.) Most of the time, Carter monitored and responded to network intrusion and vulnerability alerts raised by automated detection systems, internal and external reports, and manual investigation. (Carter Dep. at 53-54, 74-76.) This work included maintenance of both Sungard's system and outside customers' systems. (Watson Dep. at 63.) Carter also responded to identification and access alerts and handling abuse tickets when malicious activity was reported on a platform used by Sungard's customers. (Carter Dep. at 74-76.)

The parties agree that security analysts receive alerts, analyze data, and write recommendations. An analyst is alerted to a possible security breach by Sungard's ticketing system. (*Id.* at 70; Watson Dep. at 18, 69-70.) Once an analyst receives an alert, she reviews packets of data to determine whether a breach or false positive prompted the alert. (Carter Dep. at 67, 69-70; Watson Dep. at 18, 20-22.) After analyzing the data, the security analyst provides a written report with a recommendation to the customer. (Carter Dep. at 70; Watson Dep. at 18.)

The parties do not dispute that security analysts use programs and tools to analyze data packets when they receive an alert. (Carter Dep. at 66-69; Watson Dep. at 18.) The specific methodology that analysts follow to resolve security issues, however, is muddied by technical

jargon and ambiguities.[1] The standardized procedures followed by security analysts are also unclear. On the one hand, Carter cannot recall using manuals or guidelines to perform his duties. (Carter Dep. at 66.) On the other hand, Carter's supervisor criticized him for failing to "stick to published processes." (Carter's 2014 Annual Review.)

The record regarding supervision of security analysts is also inconsistent. During work, security analysts are subject to at least some supervision. Carter's supervisor testified that Carter did not have a supervisor during his night shifts before April 2015. (Watson Dep. at 30.) Although Carter did not initially have a supervisor "sitting there with [him]," he testified about communicating with supervisors in other offices during that time. (Carter Dep. at 61-62.) But communication with supervisors was sporadic. (*Id.* at 63.) Carter sometimes worked without contacting a supervisor, and supervisors only reviewed his written work product at performance reviews. (*Id.* at 63, 65-66.)

**B. Procedural History**

Carter sued Sungard in August 2017 for violations of the FLSA, the PaMWA, and the Pennsylvania Wage Payment and Collection Law ("PaWPCL"). He also asserted claims for unjust enrichment and for discrimination and retaliatory discharge under Title VII and the Pennsylvania Human Relations Act. Carter's initial Complaint sought to proceed as a collective action under the FLSA and a class action under the PaMWA and PaWPCL.

The parties stipulated to dismissal of certain claims. In May 2018, Carter agreed to withdraw the class claims under Pennsylvania law and to file an Amended Complaint. In October

---

[1] The parties should more clearly explain the security analysts' responsibilities. Otherwise, it will be difficult for a factfinder to decide whether a security analyst's duties and responsibilities relate to Sungard's general management or business operations, or whether an analyst exercises discretion and independent judgment.

2018, the parties also stipulated to dismissal of Carter's PaWPCL, retaliation, and discrimination claims. Therefore, only the FLSA, the PaMWA, and the unjust enrichment claims remained.

The parties also stipulated to conditional certification of the FLSA collective action for "all current and former security analysts who work or worked for Defendant in its Philadelphia facility for the three years prior to the date that the Complaint was filed." One individual filed his written consent to opt into the action, but subsequently was dismissed from the case. Carter, however, never filed a written consent to be a party plaintiff. Thus, the parties dispute whether Carter brought an individual FLSA action in addition to the FLSA collective action.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party," and it is material if, under substantive law, it "might affect the outcome of the suit." *Id.* at 248.

When the nonmoving party bears the burden of proof, "the party moving for summary judgment may satisfy Rule 56's burden" by "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or "demonstrat[ing] . . . that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003).

When considering a motion for summary judgment, a court must view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Anderson*, 477 U.S. at 255. The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). A court must apply the same standards to cross-motions for summary judgment. *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987); *see also Williams v. Phila. Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993) (stating that courts must "consider each motion for summary judgment separately"), *aff'd*, 27 F.3d 560 (3d Cir. 1994).

## III. DISCUSSION

### A. Carter Asserted an Individual Claim During the Statute of Limitations

Sungard argues that Carter's FLSA claim is time-barred because he only filed a collective action claim and never filed a written consent to become a party plaintiff. Carter responds that he also filed an individual FLSA claim. The Court finds that Carter sufficiently put Sungard on notice of his intent to pursue an individual claim in addition to the collective action claim. Although the collective action is time barred because Carter never filed his written consent, his individual claims commenced when he filed the original Complaint.

A FLSA action for overtime compensation "may be commenced within two years after the cause of action accrued . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255. "[T]he FLSA's statute of limitations distinguishes individual plaintiffs bringing FLSA actions from 'individual claimants' to a FLSA collective action." *Henkel v. Highgate Hotels, LP*, Civ. A. No. 15-1435, 2018 WL 5886542, at *3 (M.D. Pa. Nov. 9, 2018). Generally, an individual plaintiff commences her FLSA action for statute of limitation purposes "on the date when the complaint is filed." 29 U.S.C. § 256. In collective action cases, however, the action is not considered commenced as to

an individual claimant until the claimant files written consent to be a party plaintiff. 29 U.S.C. § 256. If a written consent is not filed with the complaint, the action commences "on the subsequent date on which such consent is filed." 29 U.S.C. § 256(b).

A plaintiff may file a dual capacity suit, in both a collective and individual capacity, "if the complaint clearly put the employer and the court on notice of such." *Matuska v. NMTC, Inc.*, Civ. A. No. 10-3529, 2012 WL 1533779, at *4 (D.N.J. Apr. 30, 2012); *cf. Acosta v. Tyson Foods, Inc.*, 800 F.3d 468, 472 (8th Cir. 2015) (holding that a plaintiff's intent to convert the collective action into an individual action must be clear). To decide whether a plaintiff sufficiently put the employer on notice, a district court reviews the caption and allegations in the complaint. *See Ochoa v. Pearson Educ., Inc.*, Civ. A. No. 11-1382, 2012 WL 95340, at *4 (D.N.J. Jan. 12, 2012). But an individual action will not be precluded simply because "the collective action allegations . . . predominate over the scattered references to an individual action." *Wilson v. Decibels of Oregon, Inc.*, Civ. A. No. 17-1558, 2019 WL 407404, at *4 (D. Or. Jan. 31, 2019).

Here, because Carter's employment ended on January 27, 2016, he needed to commence any action for an alleged FLSA violation by January 27, 2018; if the alleged violation was willful, Carter needed to commence the action by January 27, 2019. The FLSA collective action never commenced as to Carter. To date, it appears that Carter never filed a written consent to be a party plaintiff. Even under the flexible approach that courts take as to the form of consent, the Court cannot find that Carter manifested consent. *See Manning v. Gold Belt Falcon, LLC*, 817 F. Supp. 2d 451, 454 (D.N.J. 2011) (explaining that the statute "does not dictate the form consent must take, but only that consent be written and filed with the Court"). Thus, the collective action did not commence as to Carter and the statute of limitations did not toll.

Nonetheless, Carter also filed an individual claim. Carter filed his original Complaint in August 2017, and his Amended Complaint is based on the same conduct, transaction, or occurrence: unpaid overtime wages. After reviewing Carter's Amended Complaint, the Court is satisfied that Carter placed Sungard on notice of his intent to pursue an individual claim in addition to the collective action claim. Carter's Amended Complaint is distinguishable from the complaint filed in *Ochoa*, a case relied on by Sungard. In *Ochoa*, the case caption identifies plaintiffs plurally: "Roger Ochoa, on behalf of himself and others similarly situated, Plaintiffs." (Pl.'s Resp. to Def.'s Summ. J. Mot. [Pl.'s Resp.], Ex. 4.) Although Carter's case caption references collective action claims, it identifies him as a singular plaintiff: "Michael Carter 1700 West Creek Village Drive Apartment H4 Elkton, Maryland 21921 Plaintiff." Likewise, Carter's Amended Complaint is distinguishable from the complaint filed in *Acosta*, a case cited by Sungard. In *Acosta*, the complaint is titled "Original Class Action And Collective Action Complaint" whereas Carter's Amended Complaint is simply titled "Amended Complaint." (Pl.'s Resp., Ex. 5.) References to "Carter and others similarly situated" predominate, but the Amended Complaint contains a number of Carter-specific allegations that put Sungard on notice of his intent to pursue an individual claim. Therefore, Carter's individual claim commenced on the date of his original Complaint and is not time-barred.

### B. Fact Issues Preclude the Court from Granting Either Party Summary Judgment Based on the Administrative Exemption

Disputed issues of material fact preclude summary judgment on the administrative exemption. The question of whether Carter's job duties and activities excluded him from the FLSA's overtime benefits is a legal one; the question of how Carter spent his time and how much discretion he exercised at Sungard, however, is a question of fact. *Icicle Seafoods, Inc. v.*

*Worthington*, 475 U.S. 709, 714 (1986). Because there are questions about how Carter spent his time and how much discretion he exercised, neither party is entitled to summary judgment.

The FLSA generally requires employers to pay employees overtime when they work more than forty hours per week. 29 U.S.C. § 207(a)(1). Certain employees, however, are exempt from this requirement. Specifically, any individual employed in a bona fide administrative capacity is exempt from the overtime pay requirement. 29 U.S.C. § 213(a)(1). The administrative exemption to FLSA's overtime provisions apply when: (1) the employee is "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week"; (2) the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200.

The burden of establishing an exemption is on the employer and, traditionally, FLSA exemptions "are to be narrowly construed against the employer." *Pignataro v. Port Auth. of N.Y. & N.J.*, 593 F.3d 265, 268 (3d Cir. 2010). But the Supreme Court recently rejected the narrow-construction principle, stating that it "relies on the flawed premise that the FLSA pursues its remedial purpose at all costs." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). Instead, courts should give FLSA exemptions a "fair reading." *Id.*

Here, the parties do not dispute that the first element is satisfied because Carter's salary exceeded $455 per week. But the parties dispute whether the second and third elements are satisfied. The Court finds that genuine issues of material fact regarding Carter's primary duties, discretion, and independent judgment preclude the Court from granting summary judgment to either party.

1. *Whether Carter's Primary Duties Relate to Sungard's Management or General Business Operations*

An employee's work is directly related to the management or general business operations if the employee "assist[s] with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). To determine whether an employee is an administrative or production worker, it is appropriate to consider the nature of the employer's business. *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 903 (3d Cir. 1991) (explaining that production workers may "produce sales" if a company's business is selling products); *see also Antiskay v. Contemporary Graphics & Bindery Inc.*, Civ. A. No. 11-7579, 2013 WL 6858950, at *8 (D.N.J. Dec. 26, 2013) ("In order to evaluate the [second and third prong] of the administrative exemption analysis . . . the Court must first examine the nature of [the employer's] business.").

Work that is directly related to general business operations includes "work in functional areas such as . . . computer network, internet and database administration." 29 C.F.R. § 541.201(b). The sparse case law surrounding IT workers is fact-intensive and courts have recognized a dichotomy between certain types of workers. *See Lee v. MegaMart, Inc.*, 223 F. Supp. 3d 1292, 1299 (N.D. Ga. 2016) (comparing exempt cases where employees were "charged with writing code, programming, or administering databases or networks" with non-exempt cases where employees were "tasked with installing, maintaining, and troubleshooting software").

In *Turner v. Human Genome Sci., Inc.*, a case relied on by Carter, systems support technicians' work included troubleshooting and correcting problems with technical equipment such as software or network connectivity issues. 292 F. Supp. 2d 738, 742 (D. Md. 2003). The court concluded that the employees performed production-like work, not work related to business operations: the employees were simply technicians who maintained the company's general

9

operating systems without developing any type of computerized information system. *Id.* at 745. In *Bagwell v. Fla. Broadband, LLC*, a case relied on by Sungard, a network operation engineer's primary duties involved "developing, improving, and making [the employer's] network system function reliably." 385 F. Supp. 2d 1316, 1324 (S.D. Fla. 2005). Given that the employer's business "sold internet access and its success was dependent upon whether it could provide internet service," the court concluded that the employee's duties were directly related to management or general operations. *Id.* at 1325.

Here, there is conflicting evidence about Carter's job. Some evidence suggests that Carter's job involved problem-solving related to the business operations of Sungard or its customers. For example, Sungard's corporate designee testified that security analysts investigate cyberattacks by examining complex data; then, the security analyst recommends action by Sungard or the customer "[d]epending on whether [Sungard] manage[s] their server or not," which may include making "a patch so they're no longer vulnerable." (Watson Dep. at 32-33.) Other evidence suggests that Carter worked in a production environment. For example, Sungard reviewed Carter based on criteria such as the amount of tickets resolved and the time to resolve each ticket. (Carter 2014 Annual Review; Carter 2013 Annual Review.)

Relatedly, the record regarding Carter's primary duties and Sungard's business is not sufficiently developed. When asked about Sungard's general business operations, Sungard's corporate designee testified that Sungard provides services related to disaster recovery, availability, and managed security but, beyond that, he was not sure. (Watson Dep. at 9.) He did not know how those service areas related to Sungard's corporate structure. (*Id.* at 30.) For instance, when asked whether those areas are departments, he stated that "[t]here may be ten more things or

many more." (*Id.*) Such facts are relevant to the Court's inquiry. Therefore, neither party is entitled to summary judgment on the issue of the administrative exemption.

> 2. *Whether Carter's Primary Duty Included the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance*

Disputed material facts regarding Carter's latitude to make decisions also preclude summary judgment. Even if Sungard could show that Carter's job duties related to management or general business operations, there are factual disputes regarding Carter's latitude to make decisions.

An employee's discretion and independent judgment must be evaluated "in the light of all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b). According to the regulations, many factors are relevant such as:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; . . . whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; . . . whether the employee has authority to waive or deviate from established policies and procedures without prior approval; [and] . . . whether the employee investigates and resolves matters of significance on behalf of management.

*Id.*

Importantly, the regulations distinguish between discretion and skill. "The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e). But an employee who uses manuals or other established procedures at work "containing or relating to highly technical . . . matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption." 29 C.F.R. § 541.704.

In the present case, the parties have provided conflicting evidence regarding Carter's discretion at work. For example, Carter testified that he does not recall using any manuals or

11

guidelines to perform his duties. Yet Carter's supervisor claimed that he "need[ed] . . . to stick to published processes and work to improve them." (Carter 2014 Annual Review.) The supervisor also noted that Carter "seem[ed] to go through the motions." (*Id.*) Specific details about Sungard's published processes for security analysts, and analysts' ability to update or improve the processes, are lacking. These questions of fact must be resolved in order to assess the applicability of the administrative exception. Because a reasonable jury could decide the question in favor of either party, both parties' motions for summary judgment are denied.

### C. Carter Abandoned His Unjust Enrichment Claim

Carter's common law claim for unjust enrichment will be dismissed. Carter failed to address this portion of Sungard's motion for summary judgment in his response. In fact, Carter's response does not even reference his unjust enrichment claim. His failure to mention the claim constitutes abandonment. *See, e.g.*, *Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 432 (E.D. Pa. 2008) (deeming claims abandoned when plaintiff failed to address them in response to defendant's motion for summary judgment). Therefore, the Court need not address the merits of Sungard's argument and will grant as unopposed the motion regarding Carter's unjust enrichment claim.

## IV. CONCLUSION

For these reasons, the Court grants in part and denies in part Sungard's motion for summary judgment. Sungard's motion for summary judgment is denied as to the statute of limitations and the administrative exemption; it is granted as to Carter's unjust enrichment claim. Carter's motion for summary judgment is denied. An appropriate Order will be docketed separately.